**FILED**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

AUG 17 2023

JUDGE MANISH S. SHAH
UNITED STATES DISTRICT COURT

UNITED STATES OF AMERICA

v.

DANIEL M. ROSENBAUM

No. 21 CR 239

Judge Manish S. Shah

## PLEA AGREEMENT

1.     This Plea Agreement between the Acting United States Attorney for the Northern District of Illinois, MORRIS PASQUAL, and defendant DANIEL M. ROSENBAUM, and his attorney, STEVEN R. DECKER, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below.  The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with mail fraud, in violation of Title 18, United States Code, Section 1341 (Counts 1-2), and wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 3-5).

3.     Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

**Charge to Which Defendant Is Pleading Guilty**

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count Three, which charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343.

**Factual Basis**

6.     Defendant will plead guilty because he is in fact guilty of the charge contained in Count Three of the indictment.  In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3:

Beginning no later than in or around November 2016, and continuing until in or around March 2021, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant DANIEL M. ROSENBAUM devised, intended to devise, and participated in a scheme to defraud clients and to obtain money and property from those clients by means of materially false and fraudulent pretenses, representations, and promises.

More specifically, between November 2016 and March 2021, ROSENBAUM was a licensed insurance provider (also known as an insurance agent) in Illinois and owned Alexander & Rosenbaum Financial Group LLC ("Alexander & Rosenbaum"), which was based in Kenilworth, Illinois.  Alexander & Rosenbaum operated as an insurance agency that obtained quotes for insurance products from insurance companies on behalf of clients.  ROSENBAUM acted as an insurance broker, that is,

2

a representative of Alexander & Rosenbaum who obtained quotes for insurance products from insurance companies on behalf of clients.

One of the insurance products that ROSENBAUM brokered for Alexander & Rosenbaum clients was annuities, an insurance product for which a policy holder paid one or more monetary premiums to an insurance company in exchange for the right to receive a later payment or series of payments.

Under the terms of agreements ROSENBAUM entered into with various insurance companies, ROSENBAUM knew he was required to forward to the insurance companies any premium he received from a client in connection with an application for an annuity or an existing annuity. ROSENBAUM knew that he was not authorized to use clients' annuity premiums for his own benefit.

Beginning no later than November 2016, ROSENBAUM falsely told some Alexander & Rosenbaum clients that he would purchase annuities for them when he knew that he would not purchase such annuities and instead would convert the money his clients paid him for the annuities to his personal use.

When a client elected to purchase an annuity brokered by Alexander & Rosenbaum, ROSENBAUM regularly invoiced the client for the premium amount that he represented to the client would be used as payment to an insurance company for the annuity. ROSENBAUM collected the money via payment the client made by check or wire transfer to (1) ROSENBAUM, (2) Alexander & Rosenbaum, or (3) Individual A, a relative of ROSENBAUM, for whom ROSENBAUM controlled

3

multiple bank accounts. However, ROSENBAUM did not use the funds obtained from some of his clients towards the annuity premiums to insurance companies. Instead, ROSENBAUM converted premiums made by clients for those annuities to his own personal use. Because ROSENBAUM did not forward annuity premiums he collected from clients to the insurance companies, the insurance companies did not issue annuities for those clients, and the clients were not covered by the annuities that they thought they purchased.

In some cases, to deceive clients into thinking that he had actually purchased annuities for them, ROSENBAUM provided, and caused to be provided, to clients copies of fake annuity contracts and statements that purported to represent the existence of legitimate annuities from insurance companies. ROSENBAUM created those documents and knew that they were fraudulent because the documents had not been issued by the insurance companies reflected on the face of the documents and because he had not obtained annuities from insurance companies for those clients.

ROSENBAUM admits that he used premiums collected from clients that he fraudulently represented would be used as payments to insurance companies for annuities for his own personal benefit, including, among other things, making cash withdrawals, spousal and child support payments, credit card, car, and loan payments, and retail purchases at stores such as Jared Jewelry.

ROSENBAUM further admits that, in order to conceal and perpetuate his scheme: (a) he used annuity premiums that he fraudulently collected from clients to

4

repay annuities premiums he owed to other clients whose funds he had used for himself without authorization, (b) he made false statements to clients concerning repayment of their funds, including telling them that he would check with the insurance companies about the annuities he claimed he purchased for them, and (c) he attempted to persuade clients not to contact law enforcement by promising to pay them back with interest if they did not contact law enforcement about the money he owed them.

ROSENBAUM further admits that some of the clients from whom he fraudulently collected annuity premiums were over 70 years old, including Victim C, who was 84 years old at the time ROSENBAUM fraudulently collected annuity premiums from Victim C, were looking to purchase annuities to cover certain end-of-life expenses, and were particularly susceptible due to their age, among other things, to ROSENBAUM's scheme of fraudulently inducing clients to purchase annuities and converting annuity premiums to his own personal use.

ROSENBAUM admits that (a) he converted or attempted to convert annuity premium payments made by at least 18 clients to his own personal use and that the total amount of funds that he converted or attempted to convert in this manner was at least approximately $1,090,817, and (b) the total amount of funds he converted in this manner and failed to pay back to 13 of those clients was at least approximately $805,509.

5

ROSENBAUM also admits that, on or about April 5, 2019, at Mundelein, in the Northern District of Illinois, and elsewhere, for the purpose of executing the scheme to defraud, he knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer processed through the Federal Reserve System in the amount of $102,597.17 sent electronically by Victim C from Victim C's bank account to ROSENBAUM's Capital One bank account, which funds ROSENBAUM falsely claimed would be used to purchase an annuity for Victim C that ROSENBAUM never purchased, in violation of Title 18, United States Code, Section 1343.

7. Defendant, for purposes of computing his sentence under Guideline § 1B1.2, stipulates to having committed the following additional offenses:

### a. **Stipulated Offense #1**

Beginning no later than in or around June 2021, and continuing until in or around December 2022, at Hickory Hills, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant DANIEL M. ROSENBAUM devised, intended to devise, and participated in a scheme to defraud clients and to obtain money and property from those clients by means of materially false and fraudulent pretenses, representations, and promises.

More specifically, on April 15, 2021, ROSENBAUM was charged by indictment in the above-captioned case with two counts of mail fraud, in violation of Title 18, United States Code, Section 1341, and three counts of wire fraud, in violation of Title

6

18, United States Code, Section 1343. On April 22, 2021, ROSENBAUM appeared before U.S. Magistrate Judge Jeffrey T. Gilbert for an initial appearance and arraignment, at which time ROSENBAUM entered a plea of not guilty to each count of the indictment and was released from federal custody by the Court, pursuant to Title 18, United States Code, Sections 3141 and 3142, subject to certain conditions of pretrial release, including that "defendant must not violate federal, state, or local law while on release."

Between approximately June 2021 and approximately December 2022, while on pretrial release in the above-captioned case, ROSENBAUM fraudulently represented to two individuals he knew, Clients A and B, that he was a licensed insurance broker through an insurance agency he owned named Rosenbaum Family Planning, when, in fact, ROSENBAUM knew that he was no longer a licensed insurance broker. When Clients A and B expressed an interest to ROSENBAUM about purchasing annuities, ROSENBAUM collected money from Client A and B. ROSENBAUM told Clients A and B that the paid funds were for premiums required by insurance companies for the annuities ROSENBAUM promised to purchase for them.

ROSENBAUM purchased some annuities for Client A using some of the annuity premiums that Client A provided to ROSENBAUM. However, ROSENBAUM later convinced Client A to withdraw money from those annuities and give that money to ROSENBAUM to make investments for the benefit of Client A.

7

Client A agreed and gave ROSENBAUM money Client A withdrew from annuities to make investments for the benefit of Client A. ROSENBAUM never intended to make those investments and did not make those investments. Instead, he used Client A's money for his own personal benefit. Further, Client A provided ROSENBAUM additional annuity premiums to purchase annuities, but ROSENBAUM did not purchase annuities for Client A with those premiums and instead used that money for his own personal benefit.

Client B also provided ROSENBAUM an annuity premium to purchase an annuity for Client B. ROSENBAUM did not purchase an annuity for Client B and instead used the annuity premium that Client B provided for his own personal benefit.

Client A, who lived in Hickory Hills, Illinois, and Client B, who lived in South Bend, Indiana, made approximately eight payments by check or wire transfer to Rosenbaum Family Planning for annuity premiums or other investments. ROSENBAUM admits that he knowingly converted the annuity premiums and other investments Client A made to Rosenbaum Family Planning and the annuity premium that Client B made to Rosenbaum Family Planning to his own personal use, including, among other things, making spousal and child support payments, credit card payments, and car payments.

Because ROSENBAUM did not submit some of the annuity premiums Client A paid to Rosenbaum Family Planning to any insurance companies, no annuities

were issued in connection with those premiums, and Client A was not covered by annuities that Client A thought Client A purchased. Because ROSENBAUM did not submit the annuity premium Client B paid to Rosenbaum Family Planning to any insurance companies, no annuity was issued, and Client B was not covered by an annuity that Client B thought Client B purchased. In addition, ROSENBAUM admits that he made false statements to Clients A and B concerning repayment of their funds and why Clients A and B were not being paid back as requested, telling them that he would check with the insurance companies about the annuities he claimed he purchased for them and attempting to persuade them not to contact law enforcement by promising to pay them back with interest if they did not contact law enforcement about the money he owed them.

ROSENBAUM admits that he converted annuity premium payments and other investments Clients A and B made to his own personal use and that the total amount of funds that he converted in this manner was approximately $225,214.

ROSENBAUM further admits that, on or about October 26, 2021, in the Northern District of Illinois, Eastern Division, and elsewhere, for the purpose of executing the scheme to defraud, he knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate wire transfer processed through servers located outside of Illinois in the amount of $50,000 that Client A sent electronically from Client A's investment account to ROSENBAUM's U.S. Bank account, which funds

9

ROSENBAUM falsely claimed would be used to make an investment for Client A that ROSENBAUM never made, in violation of Title 18, United States Code, Section 1343, and ROSENBAUM committed this offense while on release pursuant to Title 18, United States Code, Chapter 207, in violation of Title 18, United States Code, Section 3147(1).

### b. Stipulated Offense #2

In or around March 2021, at Highland Park, in the Northern District of Illinois, and elsewhere, defendant DANIEL M. ROSENBAUM knowingly devised, intended to devise, and participated in a scheme to defraud and obtain money from Capital Plus Financial, LLC, by means of materially false and fraudulent pretenses, representations, and promises.

More specifically, ROSENBAUM acknowledges that the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program called the Paycheck Protection Program ("PPP").

ROSENBAUM further acknowledges that, in order to obtain a PPP loan, a business submitted a PPP loan application that was signed by an authorized representative of the business. The PPP loan application required the business,

·through its authorized representative, to acknowledge the program rules and make certain affirmative certifications regarding the business's eligibility. PPP loan proceeds were required to be used by the business for certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities. ROSENBAUM acknowledges that the representations the authorized business representative made in the PPP loan application concerning the business were material to a lender's decision to extend the business a PPP loan.

ROSENBAUM admits that, in March 2021, he submitted three fraudulent PPP loan applications to a lender for businesses that did not exist, that the lender approved those three loan applications based on ROSENBAUM's fraudulent representations in the applications, and that he used a total of $53,537 in PPP loan proceeds that he fraudulently obtained from those three loan applications for his own personal benefit. More specifically, on or about March 8, 2021, ROSENBAUM applied for a PPP loan in the amount of $13,540 from Capital Plus Financial, LLC ("Capital Plus"). In order to obtain the PPP loan, ROSENBAUM fraudulently represented to Capital Plus that he was an independent contractor working as a sales representative, that he had been an independent contractor since January 1, 2020, that he earned $65,000 in gross income during the 2020 tax year, and that his independent contracting business was in operation on February 15, 2020. ROSENBAUM knew at the time that he was not an independent contractor working as a sales representative, that he had not been an independent contractor since

11

January 1, 2020, that he had not earned $65,000 in gross income as an independent contractor during the 2020 tax year, and that his independent contracting business was not in operation on February 15, 2020. ROSENBAUM also fraudulently represented to Capital Plus that the PPP loan was "necessary to support the ongoing operations" of his independent contracting work, despite knowing that he did not have any "ongoing" independent contracting work. After ROSENBAUM's fraudulent PPP loan application was approved, Capital Plus deposited $13,540 in PPP loan proceeds into ROSENBAUM's bank account, which funds ROSENBAUM used for his own personal benefit.

Furthermore, on or about March 18, 2021, ROSENBAUM applied for a PPP loan in Individual A's name in the amount of $19,165 from Capital Plus, and in so applying, used Individual A's identifiers, including Individual A's name and social security number, without Individual A's knowledge and permission. In order to obtain the PPP loan, ROSENBAUM fraudulently represented to Capital Plus that Individual A was an independent contractor working as a sales representative, that Individual A had been an independent contractor since January 1, 2020, that Individual A earned $92,000 in gross income during the 2020 tax year, and that Individual A's independent contracting business was in operation on February 15, 2020. ROSENBAUM knew at the time that Individual A was not an independent contractor working as a sales representative, that Individual A had not been an independent contractor since January 1, 2020, that Individual A had not earned

12

$92,000 in gross income as an independent contractor during the 2020 tax year, and that Individual A's independent contracting business was not in operation on February 15, 2020. ROSENBAUM also fraudulently represented to Capital Plus that the PPP loan was "necessary to support the ongoing operations" of Individual A's independent contracting work, despite knowing that Individual A did not have any "ongoing" independent contracting work. After ROSENBAUM's fraudulent PPP loan application in Individual A's name was approved, Capital Plus deposited $19,165 in PPP loan proceeds into a bank account ROSENBAUM controlled, which funds ROSENBAUM used for his own personal benefit.

In addition, on or about March 25, 2021, ROSENBAUM applied for a PPP loan in a second relative's name, Individual B, in the amount of $20,832 from Capital Plus, and in so applying, used Individual B's identifiers, including Individual B's name and social security number, without Individual B's knowledge and permission. In order to obtain the PPP loan, ROSENBAUM fraudulently represented to Capital Plus that Individual B was an independent contractor working as a sales representative, that Individual B had been an independent contractor since January 1, 2020, that Individual B earned $295,000 in gross income during the 2020 tax year, and that Individual B's independent contracting business was in operation on February 15, 2020. ROSENBAUM knew at the time that Individual B was not an independent contractor working as a sales representative, that Individual B had not been an independent contractor since January 1, 2020, that Individual B had not earned

13

$295,000 in gross income as an independent contractor during the 2020 tax year, and that Individual B's independent contracting business was not in operation on February 15, 2020. ROSENBAUM also fraudulently represented to Capital Plus that the PPP loan was "necessary to support the ongoing operations" of Individual B's independent contracting work, despite knowing that Individual B did not have any "ongoing" independent contracting work. After ROSENBAUM's fraudulent PPP loan application in Individual B's name was approved, Capital Plus deposited $20,832 in PPP loan proceeds into a bank account ROSENBAUM controlled, which funds ROSENBAUM used for his own personal benefit.

ROSENBAUM admits that, on or about March 25, 2021, in the Northern District of Illinois, and elsewhere, for the purpose of executing the scheme to defraud, he knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, and signals, namely, the internet transmission of Individual B's PPP loan application to Capital Plus, which was processed through servers located outside of Illinois, in violation of Title 18, United States Code, Section 1343.

c.    **Stipulated Offense #3**

Beginning no later than in or around May 2020, and continuing until in or around September 2021, at Highland Park, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant DANIEL M. ROSENBAUM knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain

14

money in the form of unemployment insurance benefit funds from the State of Illinois, by means of materially false and fraudulent pretenses, representations, and promises.

More specifically, between May 2020 and September 2021, ROSENBAUM knew that unemployed individuals in Illinois who were terminated without fault could file a claim over the internet with the Illinois Department of Employment Security ("IDES") and receive unemployment benefits during the period of time for which they were unemployed, were able to work, and had been actively seeking work. ROSENBAUM further knew that claimants could choose to have their unemployment benefits loaded onto a debit card or directly deposited into a bank account. ROSENBAUM knew that in order to receive benefits from IDES for each weekly or biweekly period of unemployment, claimants had to certify certain eligibility information, for example, whether the claimant worked, was able and available to work, and actively sought work during the certification period. ROSENBAUM knew that those certifications could be made by phone or over the internet and that certification had to be made before unemployment insurance benefit funds would be paid.

ROSENBAUM admits that, on or about May 10, 2020, he filed a fraudulent claim for unemployment insurance benefits on his own behalf, and that on or about July 20, 2020, he filed a fraudulent claim for unemployment insurance benefits in Individual A's name and in so applying, used Individual A's identifiers, including

Individual A's name and social security number, without Individual A's knowledge and permission. ROSENBAUM knew that those two claims for unemployment insurance benefits were fraudulent because neither he nor Individual A had been terminated from employment without fault, were able to work, and had been actively seeking work. ROSENBAUM used the IDES website to fraudulently complete the IDES certification process on his own behalf and in Individual A's name, including by falsely representing to IDES that he and Individual A were entitled to benefits, had been available and able to work, and actively sought work during each certification period.

ROSENBAUM selected the direct deposit method of payment and directed IDES to deposit unemployment insurance benefit funds for him and Individual A into a bank account in ROSENBAUM's name ("Bank Account A"). ROSENBAUM knew that once he fraudulently certified eligibility for unemployment insurance benefits, IDES would provide those benefit funds to him and Individual A and would continue to provide those benefit funds to him and Individual A as long as ROSENBAUM continued to certify eligibility for the benefits.

As a result of the fraudulent claims for unemployment insurance benefits ROSENBAUM made, IDES deposited unemployment insurance benefit funds into Bank Account A and bank accounts ROSENBAUM controlled, including an account in the name of Individual A. ROSENBAUM withdrew those benefit funds from Bank Account A and bank accounts ROSENBAUM controlled, knowing that he was not

16

entitled to those funds, and ROSENBAUM used those funds for his own personal use and benefit.

ROSENBAUM admits that, in total, he received approximately $65,826 in fraudulently obtained unemployment insurance benefit funds from IDES in his name and in the name of Individual A.

ROSENBAUM further admits that, on or about September 18, 2020, in the Northern District of Illinois, and elsewhere, for the purpose of executing the scheme to defraud, he knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain writings, signs, and signals, namely, an interstate transfer of unemployment insurance benefit funds in the amount of $1,800 sent electronically by IDES to Bank Account A, which was processed through servers located outside of Illinois, in violation of Title 18, United States Code, Section 1343. ROSENBAUM admits that the $1,800 IDES sent to him on or about September 18, 2020, constituted unemployment insurance benefit funds to which he was not entitled and that he received those funds only after he falsely represented to IDES that, for the certification periods of July 25, 2020, to September 5, 2020, he was entitled to unemployment insurance benefits, had been available and able to work, and actively sought work, among other things.

## Maximum Statutory Penalties

8.      Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

17

a.     A maximum sentence of 20 years' imprisonment.  This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.  Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.     Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.     Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

9.     Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities

18

among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

10. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points, except as specified below:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2021 Guidelines Manual.

b. **Offense Level Calculations**.

i. Pursuant to Guideline § 3D1.2(d), Count Three and Stipulated Offenses #1, #2, and #3 group.

ii. The base offense level is 7 pursuant to Guideline § 2B1.1(a)(1).

iii. Pursuant to Guideline § 2B1.1(b)(1)(H), the offense level is increased by 14 levels because the total intended loss from the offenses set forth above in paragraphs 6 and 7 was at least $1,435,394 and the total actual loss was at least $1,150,086, and both figures are between $550,000 and $1,500,000.

iv. It is the government's position that, pursuant to Guideline § 2B1.1(b)(2)(B), the offense level is increased by 4 levels because the offenses set forth above in paragraphs 6 and 7 resulted in substantial financial hardship to five

19

or more victims. It is the defendant's position that (a) a 4-level enhancement is not warranted under Guideline § 2B1.1(b)(2)(B) because the offenses set forth above in paragraphs 6 and 7 resulted in financial loss to at least 13 victims but did not result in substantial financial hardship to five or more of those victims, and (b) the offense level should be increased by 2 levels pursuant to Guideline § 2B1.1(b)(2)(A)(i) because the offenses set forth above in paragraphs 6 and 7 involved 10 or more victims. Each party is free to present evidence and argument to the Court on this issue at sentencing.

v. It is the government's position that, pursuant to Guideline § 2B1.1(b)(10)(C), the offense level is increased by 2 levels because the offenses and relevant conduct in Count Three and Stipulated Offense #1 involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting sophisticated means by, among other things, creating and using counterfeit insurance documents, misappropriating the personally identifiable information of others, and creating and submitting false loan applications. Defendant's position is that this enhancement does not apply. Each party is free to present evidence and argument to the Court on this issue at sentencing.

vi. Pursuant to Guideline § 2B1.1(b)(11)(C)(i), the offense level is increased by 2 levels because Stipulated Offenses #2 and #3 involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, namely the unauthorized use of Individual

A's and Individual B's identifiers to fraudulently obtain PPP loan funds and the unauthorized use of Individual A's identifiers to fraudulently obtain unemployment insurance benefit funds.

vii.     Pursuant to Guideline § 3A1.1(b)(1), the offense level is increased by 2 levels because defendant knew or should have known that one or more victims of the offenses set forth above in paragraphs 6 and 7 was a vulnerable victim, including Victim C.

viii.     Pursuant to Guideline § 3B1.3, the offense level is increased by 2 levels because the defendant abused a position of private trust or used a special skill in a manner that significantly facilitated the commission and concealment of the offenses and relevant conduct referenced in Count Three and Stipulated Offense #1.

ix.     Pursuant to Guideline § 3C1.3, the offense level is increased by 3 levels because the defendant committed Stipulated Offense #1 while on pretrial release in connection with another federal offense, namely Count Three, and the statutory sentencing enhancement under 18 U.S.C. § 3147 applies.

x.     Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and

the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

xi.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant has no criminal history points, and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, it is the government's position that the anticipated offense level is 33, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 135 to 168 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose. Defendant's position is that the anticipated offense level is 29, which, when combined with the anticipated

22

criminal history category of I, results in an anticipated advisory sentencing guidelines range of 87 to 108 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

11.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by

23

such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

12. Each party is free to recommend whatever sentence it deems appropriate.

13. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

14. Regarding restitution, defendant acknowledges that the total amount of restitution owed to victims is at least $1,150,086, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing.

15. Restitution shall be due immediately and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3663(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

16.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

17.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

18.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment, as well as the forfeiture allegation as to defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

19.     This Agreement is entirely voluntary and represents the entire agreement between the Acting United States Attorney and defendant regarding defendant's criminal liability in case 21 CR 239.

20.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other

federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

21.     Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a.     **Trial rights**.  Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury.  However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random.  Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a

26

reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.     At a trial, defendant could present witnesses and other evidence on his own behalf.  If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

viii.     With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine

27

whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

    b. **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

    22. Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

**Presentence Investigation Report/Post-Sentence Supervision**

    23. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

    24. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's

Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

25.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

26.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including

29

providing financial statements and supporting records as requested by the United States Attorney's Office.

27.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

### Conclusion

28.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

29.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement.   Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement.   Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of

limitations between the signing of this Agreement and the commencement of such prosecutions.

30. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

31. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

32. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: __8-17-23__

*Morris Pasqual* by SME

MORRIS PASQUAL
Acting United States Attorney

PRASHANT KOLLURI
Digitally signed by PRASHANT KOLLURI
Date: 2023.08.03 17:11:06 -05'00'

PRASHANT KOLLURI
Assistant U.S. Attorney

DANIEL M. ROSENBAUM
Defendant

STEVEN R. DECKER
Attorney for Defendant

31